**THIRD DIVISION**
**GOBEIL, J.,**
**COOMER and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 15, 2019**

# In the Court of Appeals of Georgia

A18A2075. MCCLENDON v. HARPER et al.

HODGES, Judge.

Glen McClendon sued his former employer, the Metropolitan Atlanta Rapid Transit Authority, and four MARTA employees (the "Individual Defendants") based on their alleged involvement in events leading to his arrest for theft by taking of a company van and his subsequent termination. McClendon asserts claims for false imprisonment, malicious arrest, and intentional infliction of emotional distress against the Individual Defendants. He also asserts a claim against MARTA for negligent hiring, training, and supervision as well as for vicarious liability for the torts of the Individual Defendants. He seeks punitive damages from all defendants. The trial court granted summary judgment in favor of all defendants as to all of McClendon's claims. McClendon appeals, and, for the reasons explained below, we affirm.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[.]" OCGA § 9-11-56 (c).

> [A] defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case, but may point out by reference to the evidence in the record that there is an absence of evidence to support any essential element of the nonmoving party's case.

(Citation and punctuation omitted.) *Cowart v. Widener*, 287 Ga. 622, 623 (1) (697 SE2d 779) (2010).

Viewed in this light, the record shows that, in January 2014, McClendon was a MARTA communications technician with over 20 years of service who was assigned to work on projects on the east line. Calvin Harper was another technician, and Anthony Pines, Derek Terry, and Arnold Campbell were supervisors in McClendon's department. In connection with his work on the east line, McClendon regularly drove MARTA vehicle 15652 ("the van"). Under MARTA official policy, department vehicles must be checked into a facility called "the annex" when not in use for department business.

On January 22, McClendon worked on the east line inspecting emergency phone lines until about 4:00 p.m. and then checked the van into the annex. He drove his personal vehicle to the Candler Park station, where he worked several hours overtime on a special project. Harper, who was then assigned to the south line, had previously been assigned to the east line, and he also had a key to the east line van. After McClendon checked the van into the annex on January 22, Harper took the van from the annex and parked it at the Kensington station on the east line, planning to retrieve it the next morning. McClendon deposed that, against regulations, Harper often used the van after hours for personal purposes and left it parked at a station, rather than at the annex. In his deposition, Harper conceded that he was written up many times for leaving a department van overnight at a location other than the annex in violation of department policies.

After working at the Candler Park station on the evening of January 22, McClendon drove his personal vehicle to the Kensington station to clock out, arriving at approximately 9:45 p.m., and found the van in the parking lot there. Due to the late hour, McClendon did not call his supervisor about the location of the van. He drove the van from the Kensington station to the Maintenance of Way ("MOW") facility near the Avondale station on the east line in preparation for a project scheduled there

3

for the next day. He rode the train back to the Kensington station and went home in his personal vehicle.

Early on the morning of January 23, Harper went to the Kensington station to get the van, where he had left it the evening before, unaware that McClendon had moved it to the MOW facility. Harper called Pines about the missing van. Harper also called several other technicians to ask if anyone had moved the van, but, because of personal hostility between him and McClendon, he did not call McClendon to ask about the van.

After hearing from Harper, Pines testified that he also called the technicians, asking each, "do you have the van?" According to McClendon, Pines asked him, "Do you have [the van] at Candler Park?" Since McClendon left the van at the Avondale station and did not have it at the Candler Park station, he answered, "No." According to McClendon, he tried to tell Pines that he left the van at Avondale the night before, but Pines hung up on him.

Meanwhile, Harper went to the office to meet with Pines, who told him that all of the technicians had been called and no one seemed to know the location of the van. Pines deposed that Harper told him that he was going to report the van missing to the MARTA police although, according to Pines, that was not the ordinary practice.

4

Harper called the MARTA police at about 9:00 a.m. on January 23. According to the MARTA detective who first interviewed Harper at about 9:45 a.m., McClendon became the focus of the investigation because Harper told the detective that he suspected McClendon had taken the van. Detectives reviewed station video, the use logs of McClendon's employee Breeze card, which he used to travel on the train, and his employee proximity card, which he used to enter employees-only areas of the stations.

The station video and card data showed that at about 9:45 p.m. on January 22, McClendon left the Kensington station in the van and parked it at the MOW facility near the Avondale station and then rode the train from there back to the Kensington station and left in his personal vehicle.

A few hours after Harper's initial report, Pines called McClendon and asked him to come in to the office to speak to a detective. McClendon did so after moving the van from the MOW facility back to the Kensington station. Pines deposed that he knew where the van was before lunchtime, that he had no evidence that McClendon stole anything, and that he does not know why the police continued their involvement after the van was located. According to Harper, he never thought that the van had

5

been stolen but believed, based on what co-workers told him about McClendon's tasks the day before, that McClendon had moved the van to the Candler Park station.

After arriving at his office, McClendon went with Pines and Harper to the MARTA police office, and detectives began questioning him. Fearing that he was being falsely accused of theft, McClendon stated that he did not want to talk without a union representative or a lawyer present. A union representative was summoned, but pursuant to MARTA police rules the detectives did not allow him into the interrogation room. Harper was also interviewed again.

Based in part on reports from McClendon's supervisors that his duty shift on January 22 ended at 6:00 p.m., hours before he moved the van from the Kensington station to the Avondale station, and that he lacked authority to use MARTA vehicles when not on duty, a MARTA detective determined that there was probable cause to arrest McClendon and placed him under arrest, without a warrant, for theft by taking

a motor vehicle.[1] The detective deposed that the decision to arrest McClendon was his decision, along with the detective's supervisor.

According to McClendon, Pines told him privately that he reported the van missing as a prank or joke on him (McClendon) but that he would not admit that to the officers because he was not "going to jail for this prank that went bad." McClendon's wife deposed that Pines called her on the day McClendon was arrested and told her the incident was "a prank gone really bad." In an affidavit, Pines stated that he told McClendon's wife that it appeared that the incident was "a prank that had gone bad" and that, by saying this, he meant that it appeared that McClendon had played a prank on Harper by moving the van.

The day after McClendon was arrested, a detective obtained an arrest warrant for McClendon. As a result of the arrest, McClendon spent several nights in jail

[1] Pines, Terry, and Campbell deposed that McClendon was not authorized for overtime work on January 22 and was therefore not authorized to use the van after his shift ended at 6:00 that day. McClendon testified that he had clocked out at about 11:00 p.m. and that Terry changed the record to show that McClendon clocked out at 6:00 p.m. to falsify evidence that he was off duty when he moved the van from the Kensington station to the MOW facility. McClendon has not produced evidence to corroborate this accusation and we "will not cull the record in search of error" on his behalf. (Citation omitted.) *Vitner v. Miller*, 223 Ga. App. 692, 693 (1) (479 SE2d 1) (1996). Even if McClendon was not authorized to use the van, the facts do not establish that he committed a theft of the van simply by moving it from one MARTA property to another.

before he was released on bond. The DeKalb County District Attorney's office reviewed the case and decided not to prosecute McClendon and dismissed the charge.

MARTA decided to terminate McClendon for stealing MARTA property, lying to management, and otherwise violating MARTA's code of ethics and standards of conduct. His union negotiated with MARTA, which agreed to allow him to retire in lieu of termination, conditioned on his agreement to present his notice of retirement by November 18, 2014 and to refrain from initiating any grievance or legal proceeding concerning severance of his employment with MARTA. McClendon submitted his notice to MARTA on that date. He then contacted the benefits provider, Zenith American Solutions, Inc., and an agent told him that he could take early retirement immediately or get full retirement with increased benefits if he waited until 2016 to retire. McClendon chose to delay his pension, and, according to him, he submitted all required documents. Months later, MARTA changed the end of his employment to termination for cause, because he did not timely apply for retirement as required by their agreement. According to McClendon, his pension benefit was greatly reduced as a result.

1. McClendon contends that the trial court erred in granting the defendants' motion for summary judgment on his claims for false imprisonment and malicious arrest. We disagree.

Under Georgia law, there are

three different related torts in this area, although the distinctions among the three are not always clear in our case law: (1) false imprisonment, which is "unlawful" detention without judicial process, or without the involvement of a judge at any point (OCGA § 51-7-20[2]); (2) false or malicious arrest, which is detention "under process of law" (OCGA § 51-7-1[3]); and (3) malicious prosecution, which is detention with judicial process followed by prosecution (OCGA § 51-7-40). An arrest "under process of law" is an arrest made pursuant to a warrant and the key distinction between malicious arrest and false imprisonment under

---

[2] OCGA § 51-7-20 ("False imprisonment is the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty."). See also *Smith v. Wal-Mart Stores E.*, 330 Ga. App. 340, 343 (2) (a) (765 SE2d 518) (2014) ("The essential elements of the cause of action for false imprisonment are a detention of the person of another for any length of time, and the unlawfulness of that detention.") (citation and punctuation omitted).

[3] OCGA § 51-7-1 ("An arrest under process of law, without probable cause, when made maliciously, shall give a right of action to the party arrested."). See *Garner v. Heilig-Meyers Furniture Co.*, 240 Ga. App. 780, 781-782 (1) (525 SE2d 145) (1999) (Where there has been an arrest pursuant to a warrant and "after the arrest the warrant is dismissed or not followed up, the remedy is for malicious arrest.") (citation and punctuation omitted).

OCGA §§ 51-7-20 and 51-7-1 is whether the person was detained using a warrant or not.

*Ferrell v. Mikula*, 295 Ga. App. 326, 329 (2) (672 SE2d 7) (2008).

> *(a) False imprisonment.*

> Where the alleged unlawful detention is premised upon an arrest by officers acting without a warrant, the following legal principles are applicable: Whoever arrests or imprisons a person without a warrant is guilty of a tort, unless he can justify under some of the exceptions in which arrest and imprisonment without a warrant are permitted by law; and the burden of proving the existence of the facts raising the exception is upon the person making the arrest or inflicting the imprisonment.

(Citations, punctuation, and emphasis omitted.) *Collins v. Sadlo*, 167 Ga. App. 317, 318 (306 SE2d 390) (1983).

> *(1) Individual Defendants*

With regard to the element of an unlawful detention, there is no evidence that McClendon was confined by anyone before the MARTA detective placed him under arrest without a warrant.[4]

---

[4] *Smith*, supra, 330 Ga. App. at 343-344 (2) (a) ("A detention need not consist of physical restraint, but may arise out of words, acts, gestures, or the like, which

Because none of the Individual Defendants personally detained McClendon, as to them, this case presents the question of whether there is evidence that any of them wrongfully procured McClendon's warrantless arrest by the detective.

> [Georgia] law draws a fine line of demarcation between cases where a party directly or indirectly urges a law enforcement official to begin criminal proceedings and cases where a party merely relays facts to an official who then makes an independent decision to arrest or prosecute. In the former case there is potential liability; in the latter case there is not.

(Citation, punctuation, and emphasis omitted.) *Smith*, supra, 330 Ga. App. at 343 (2) (b) (i).[5] In this case, there is evidence that Harper told the MARTA detective that he

induce a reasonable apprehension that force will be used if plaintiff does not submit; and it is sufficient if they operate upon the will of the person threatened, and result in a reasonable fear of personal difficulty or personal injuries. However, there is no issue for the jury where there is no detention.") (citations and punctuation omitted); see also OCGA §§ 51-7-21 ("If imprisonment is by virtue of a warrant, neither the party who procured the warrant in good faith nor the officer who executed the warrant in good faith shall be liable for false imprisonment even if the warrant is defective in form or is void for lack of jurisdiction. In such cases, good faith must be determined from the circumstances."), 51-7-22 ("If false imprisonment is the act of several persons, they may be subject to an action jointly or separately. If jointly, all shall be responsible for the entire recovery.").

[5] See also *Turnage v. Kasper*, 307 Ga. App. 172, 180 (1) (b) (i) (704 SE2d 842) (2010) ("A distinction must be drawn . . . between actually instigating or procuring the institution of criminal proceedings, and merely providing information to a law enforcement official without in any way attempting to influence his judgment. A

11

suspected McClendon of taking the van. McClendon has not identified any evidence, however, that any of the Individual Defendants directed or urged the detective to arrest him. Rather, the evidence shows the Individual Defendants merely conveyed factual information to the detective. Indeed, the detective testified the decision to arrest McClendon was made solely by him and his supervisor, and at the time that decision was made the detective had conducted an investigation through which he became aware of both the location of the van and how it came to be there. Consequently, the trial court correctly granted the Individual Defendants' motion for summary judgment as to his claim for false imprisonment.

*(2) MARTA*

As for MARTA, McClendon argues that it is vicariously liable for the actions of its employees. As discussed above, the Individual Defendants are not liable for

person may be held liable for malicious prosecution when he provides information to an investigating officer that he knows to be false, and in doing so unduly influences the authorities to take the complained of actions.") (footnotes omitted); *Ferrell*, supra, 295 Ga. App. at 330 (2) (Where the plaintiff establishes an unlawful detention, "the next issue to consider is whether [the defendant] caused the arrest. Whether a party is potentially liable for false imprisonment by directly or indirectly urging a law enforcement official to begin criminal proceedings or is not liable because he merely relates facts to an official who then makes an independent decision to arrest is a factual question for the jury. The party need not expressly request an arrest, but may be liable if his conduct and acts procured and directed the arrest.") (citations and punctuation omitted).

12

false arrest, therefore, summary judgment was proper as to MARTA on McClendon's claims based on the actions of the Individual Defendants. See *PN Express, Inc. v. Zegel*, 304 Ga. App. 672, 680 (5) (697 SE2d 226) (2010) ("Generally, where a party's liability is solely vicarious, that party and the actively-negligent tortfeasor are regarded as a single tortfeasor. Thus . . . a verdict exonerating the employee also exonerates the employer.")

The same result is proper as to McClendon's claims based on the actions of the detective. Under Georgia law, "official immunity, also known as qualified immunity, affords limited protection to public officers and employees sued in their personal capacity." *Reed v. DeKalb County*, 264 Ga. App. 83, 86 (589 SE2d 584) (2003).[6] "The rationale for this immunity is to preserve the public employee's independence of action without fear of lawsuits and to prevent a review of his or her judgment in hindsight." (Citation omitted.) Id. "Although official immunity does not apply to

---

[6] The MARTA detective who arrested McClendon is a peace officer under Georgia law and thus has the "authority and immunities equivalent to those of a peace officer of the municipality or county in which [he was] discharging the duties as a member of such force." Ga. L. 1994, Vol. 2, pp. 4959-4961 (¶ 3) (amending Ga. L. 1965, Vol. 2, p. 2243 et seq. (the Metropolitan Atlanta Rapid Transit Authority Act of 1965) (§ 8 (o))). The undisputed evidence shows that the detective was certified by the Georgia Peace Officer Standards and Training Council and had the same authority as any DeKalb County police officer.

13

purely ministerial duties, public officials are immune from individual liability for discretionary acts undertaken in the course of their duties and performed without wilfulness, malice, or corruption." (Citation omitted.) Id.

The detective's decision to arrest McClendon was a discretionary act undertaken in the course of his official duties. See *Mercado v. Swoope*, 340 Ga. App. 647, 650 (798 SE2d 291) (2017) ("The decision to make a warrantless arrest, such as the one at issue here, is considered a discretionary act within the scope of the officer's official functions.") (citation omitted). We must therefore determine if a fact issue exists about whether the detective acted "without wilfulness, malice, or corruption." (Citation omitted.) *Reed*, supra, 264 Ga. App. at 86.

To be sure, the detective's decision to arrest McClendon was, at best, misguided. But "[e]ven when an arresting officer operates on a mistaken belief that an arrest is appropriate, official immunity still applies." Id. Indeed, absent "actual malice" — that is, "a deliberate intent to do wrong" — or "deliberate intent to injure," "no liability attaches to the officer's exercise of his lawful discretion even when the decision to effectuate the arrest is flawed." Id. Nothing in the record shows that the detective intended to do wrong or intended to injure McClendon. Given that the detective would have been immune from McClendon's claims, MARTA cannot be

14

held vicariously liable for McClendon's false imprisonment claim based on his actions. See *PN Express, Inc.*, supra, 304 Ga. App. at 680 (5).

(b) *Malicious arrest.* It is undisputed that none of the Individual Defendants were involved in obtaining the warrant for McClendon's arrest. Consequently, summary judgment was proper as to the Individual Defendants and as to MARTA for vicarious liability based on their actions. See *PN Express, Inc.*, 304 Ga. App. at 680 (5).

As for vicarious liability for MARTA due to the actions of the detective, because he would be entitled to official immunity, there can be no liability absent proof of actual malice in the sense of a deliberate intent to cause McClendon the harm he suffered.[7] *Everson v. Dekalb County School Dist.*, 344 Ga. App. 665, 668 (2) (811 SE2d 9) (2018); *Tuggle v. Rose*, 333 Ga. App. 431, 434-435 (3) (773 SE2d 485) (2015); *Griswold v. Collins*, 318 Ga. App. 556, 558 (2) (a) (734 SE2d 425) (2012); *Selvy v. Morrison*, 292 Ga. App. 702, 704 (665 SE2d 401) (2008); see Charles R. Adams, Ga. Law of Torts § 29.5 (updated December 2017). As explained above, there

---

[7] Peace officers employed as part of MARTA's security force "shall be personally liable to one who sustains special damages as a result of any official act of such officers if done oppressively, maliciously, corruptly, or without authority of law." Ga. L. 1994, Vol. 2, pp. 4959-4961 (¶ 3).

is no such evidence here. Consequently, MARTA cannot be held vicariously liable for malicious arrest based on the actions of the detective, and summary judgment was proper as to this claim. See *PN Express, Inc.*, 304 Ga. App. at 680 (5).

2. McClendon contends that the trial court erred in granting the motion for summary judgment on his claim for intentional infliction of emotional distress. We find no error.

"Georgia has long recognized a cause of action for intentional infliction of emotional distress." (Citation omitted.) *Steed v. Fed. Nat. Mortgage Corp.*, 301 Ga. App. 801, 810 (2) (b) (689 SE2d 843) (2009).

> However, the burden which the plaintiff must meet in order to prevail in this cause of action is a stringent one. To prevail, a plaintiff must demonstrate that: (1) the conduct giving rise to the claim was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe.

(Citation and punctuation omitted.) Id. Under the second element,

> [i]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct . . . is so outrageous in character, and so extreme in degree,

16

as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Whether actions rise to the level of extreme and outrageous conduct necessary to support a claim of intentional infliction of emotional distress is generally a question of law."

(Punctuation and footnotes omitted.) *Abdul-Malik v. AirTran Airways*, 297 Ga. App. 852, 856 (1) (678 SE2d 555) (2009). "[C]omments made within the context of one's employment," including false accusations of dishonesty in the workplace, "may be horrifying or traumatizing, but they are generally considered a common vicissitude of ordinary life." *Southland Propane, Inc. v. McWhorter*, 312 Ga. App. 812, 819 (3) (720 SE2d 270) (2011). Such comments and accusations do not "exceed the bounds usually tolerated by society" and thus do not constitute the extreme and outrageous conduct needed for an intentional infliction of emotional distress claim. Id. See also *Lively v. McDaniel*, 240 Ga. App. 132, 134 (2) (522 SE2d 711) (1999) ("Defamatory or derogatory remarks regarding one's employment generally do not rise to [the] level" of extreme and outrageous conduct that is the threshold for an intentional infliction of emotional distress claim.) (citations omitted).

 *(a) The Individual Defendants*

17

Viewed in the light most favorable to McClendon, the record could support a finding that Harper, having no reason to believe that the van had been stolen, vindictively led his supervisors and the investigators to suspect that McClendon had done so. The record could also authorize a finding that the supervisors cravenly allowed the prank to unfold to its harmful conclusion, even though Harper's own report showed that he himself had wrongfully taken the van out after hours, and even after learning that McClendon had simply moved the van to a more secure location (MARTA's MOW facility). Nevertheless, we conclude that the Individual Defendants' conduct was not so outrageous and extreme as to support a claim for intentional infliction of emotional distress under Georgia law. *Southland Propane*, supra, 312 Ga. App. at 819 (3) (accusing an employee and minority shareholder of misappropriating corporate funds and forgery, terminating his employment, and ordering him to leave the premises did not exceed bounds usually tolerated by society); *Kramer v. Kroger Co.*, 243 Ga. App. 883, 888 (3) (a) (534 SE2d 446) (2000) (suspending and investigating employee over missing cash, and employer's conditioning of employee's return on a demotion and liability release, was not so outrageous as to permit employee's recovery for intentional infliction of emotional distress); *Lively*, supra, 240 Ga. App. at 134 (2) (employer's statements regarding a

18

former employee's conduct, including statements that implied the employee had stolen and retained important documents belonging to the insurance company, were not sufficiently outrageous to give rise to claim for intentional infliction of emotional distress).[8]

*(b) MARTA*

Given that summary judgment was proper as to the conduct of the Individual Defendants as to McClendon's intentional infliction of emotional distress claim,

---

[8] See also *Garcia v. Shaw Indus., Inc.*, 321 Ga. App. 48, 52-53 (1) (b) 741 SE2d 285 (2013) (employer's filing of an administrative fraud complaint with the State Board of Workers' Compensation that accurately reported that former employee had obtained employment under an alias was not sufficiently extreme and outrageous conduct to support former employee's claim for intentional infliction of emotional distress); *Abdul-Malik*, supra, 297 Ga. App. at 857 (1) (employer's question, during the course of an investigation into an alleged workplace crime by employee, whether employee was a Muslim and a police detective's statement that employee was a terrorist and a liar and was guilty of making terroristic threats did not rise to the level of extreme and outrageous conduct as to permit employee's recovery for intentional infliction of emotional distress); *Phillips v. Pacific & S. Co.*, 215 Ga. App. 513, 516 (451 SE2d 100) (1994) (television station's publicly broadcasting false statement that it terminated reporter because, without the station's knowledge, he had signed a movie deal regarding a murder case, did not rise to the requisite level of outrageousness and egregiousness necessary to support a claim for intentional infliction of emotional distress); *Peoples v. Guthrie*, 199 Ga. App. 119, 121 (404 SE2d 442) (1991) (employer falsely accusing an employee, in the presence of her co-workers, of cheating on an employment-related proficiency test was not sufficiently extreme or outrageous to sustain a claim for intentional infliction of emotional distress).

summary judgment was also proper as to MARTA's vicarious liability on this claim. See *PN Express, Inc.*, 304 Ga. App. at 680 (5).

3. McClendon contends that the trial court erred in failing to reach the issues of damages relating to his termination and punitive damages. Again, we disagree.

If McClendon has any recourse for wrongful termination, it is through the Labor Agreement between MARTA and his union.[9] Pretermitting whether McClendon was entitled to pursue the Labor Agreement's grievance procedures, he has not shown any basis for recovering damages for wrongful termination in the framework of this litigation.[10]

---

[9] See *Fink v. Dodd*, 286 Ga. App. 363, 365 (1) (a) (649 SE2d 359) (2007) ("In Georgia, the general rule is that an employee, employed at will and not by contract, cannot bring an action against his employer for wrongful discharge from employment or wrongful interference with the employment contract when and where he is an at will employee with no definite and certain contract of employment. The employer with or without cause and regardless of its motives may discharge the employee without liability.") (citation and punctuation omitted); *Mr. B's Oil Co. v. Register*, 181 Ga. App. 166, 167 (351 SE2d 533) (1986) ("Wrongful termination is a tortious act growing out of the breach of the employment contract. . . . [I]n the absence of a controlling written contract of employment, there is *no* cause of action against the employer for alleged wrongful termination.") (citation omitted).

[10] Even if McClendon's argument had been properly presented, punitive damages are not available absent liability on an underlying cause of action. See *Bartenfeld v. Chic-Fil-A*, 346 Ga. App. 759, 769 (5) (815 SE2d 273) (2018) ("Under Georgia law, a plaintiff cannot recover punitive damages when the underlying claim fails.") (citation omitted). Because McClendon failed to demonstrate any liability by

20

4. McClendon contends that the trial court erred by granting summary judgement on his claims against MARTA for negligent hiring, training, and supervision. We disagree. Because MARTA has "admit[ted] the applicability of respondeat superior, it is entitled to summary judgment on claims for negligent entrustment, hiring, and retention." *Durben v. American Materials, Inc.*, 232 Ga. App. 750, 751 (1) (503 SE2d 618) (1998). McClendon seeks to invoke an exception to that rule, which applies if he has a valid claim for punitive damages against MARTA. See id. But he does not have a valid claim for punitive damages against MARTA. See *Metropolitan Atlanta Transit Auth. v. Boswell*, 261 Ga. 427, 427 (405 SE2d 869) (1991) ("[A]n award of punitive damages against MARTA would violate the public policy of Georgia, and therefore is impermissible as a matter of law."). Accordingly, the trial court did not err by granting MARTA summary judgment on these grounds.

*Judgment affirmed. Gobeil and Coomer, JJ., concur.*

---

the defendants, his claim for punitive damages also fails.